**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph MARGALA, Defendant-Appellant.**

No. 80–1653.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1981.

Decided Nov. 30, 1981.

As Amended Feb. 8, 1982.

Thomas R. Sheridan, Simon & Sheridan, Los Angeles, Cal., for defendant-appellant.

Warren P. Reese, Asst. U. S. Atty., argued, M. James Lorenz, U. S. Atty., Warren P. Reese, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and RAMIREZ,* District Judge.

CHOY, Circuit Judge:

Joseph Margala appeals his convictions for three counts of fraud in the purchase of securities under 15 U.S.C. § 78j(b) and 12 counts of mail fraud under 18 U.S.C. § 1341. He also seeks review of two of the conditions imposed on his probation. We hold that both the convictions and the conditions are proper.

I. *Facts*

This case concerns Margala's use of the mails to conceal a very complicated scheme to freeze out a corporation's public shareholders and underpay them for their stock.

---

* The Honorable Raul A. Ramirez, United States District Judge for the Eastern District of California, sitting by designation.

Although the scheme itself did not violate federal law, it supplies the background needed to appreciate the significance of the facts withheld and misstated in the letters.

### A. *The Scheme*

Margala was the general manager of California Business Service and Audit Co. (CBS&A), which did bookkeeping work for small businesses. CBS&A ran into financial difficulties in the late 1960's. Walter Wencke, a prominent San Diego lawyer and businessman, masterminded a series of transactions that enabled him and a few others, including Margala, to take unfair advantage of CBS&A's uncertain condition.

There seem to have been five basic steps in the scheme. First, Wencke gained control of CBS&A. Crateo Corporation, a publicly-traded corporation controlled by Wencke, exchanged some of its stock for all of the outstanding CBS&A stock.

Second, Crateo immediately caused CBS&A to undergo Chapter XI bankruptcy proceedings. Wencke and his cohorts used the resulting uncertainty about CBS&A's financial condition to excuse their supplying incomplete information to the public shareholders.

Third, Wencke isolated the CBS&A stock from Crateo's other holdings. He created BHC, which transferred all of its stock to Crateo in exchange for Crateo's CBS&A stock. Margala's involvement was clear by then, as he became BHC's president.

The fourth step increased the interest in BHC held by Wencke, Margala, and a few other insiders. The BHC directors resolved to increase the number of common shares from 1.5 million to 3.5 million. The insiders purchased some of the new shares with money borrowed indirectly from BHC. Other corporations controlled by Wencke also purchased some of these shares on behalf of the insiders. In addition, BHC issued stock bonuses to Margala and other CBS&A employees.

Finally, the insiders froze the public shareholders out of the corporation. Since Margala and others held large amounts and the public shareholders relatively small amounts of BHC stock, this was accomplished by combining shares and eliminating fractional interests. First, there was a 10–to–1 reverse stock split. Then Bookkeepers, Ltd. was formed with Margala as president. Margala and others voted to merge BHC into Bookkeepers and convert each 100 shares of BHC common stock into one share of Bookkeepers stock. This left the remaining public shareholders with about one percent of Bookkeepers stock. In both transactions, the amount paid for fractional shares was less than their fair market value.

### B. *The Letters*

Margala used the mails to conceal this scheme. The financial statements mailed to the public shareholders listed CBS&A's liabilities inaccurately and withheld available information about the value of CBS&A stock. The information packets on the pending merger and the letters concerning the purchase of the fractional shares misrepresented the actual value of BHC stock, and failed to disclose the insiders' conflicts of interests in their use of BHC money to purchase BHC stock for themselves and in their decisions fixing the amount to be paid for fractional shares.

Despite the secrecy, some shareholders became suspicious. When shareholder Stanley Maki objected to the sparse information supplied about the merger, Margala wrote back: "No group of directors can satisfy all shareholders. We simply try to do the best we can." Maki and at least one other shareholder complained to the California Department of Corporations. The Corporations Commissioner subpoenaed shareholder lists from BHC and Bookkeepers. In an effort to circumvent California disclosure laws, which applied only if a significant number of BHC shareholders had addresses in California, Margala and others supplied incorrect out-of-state addresses for major shareholders.

## II. *The Convictions*

### A. *Sufficiency of the Evidence*

■ There is ample evidence from which the jury could have found beyond a reason-

able doubt that Margala participated actively in the scheme and used the mails to knowingly withhold and misstate information. Although Margala questions the sufficiency of the evidence, his major argument is that his involvement did not violate federal law.

### B. *Materiality*

The thrust of Margala's argument is that he did not violate federal law because he did not withhold or misstate *material facts*. The test for materiality, according to Margala, is whether the investor could have used the information to obtain a state injunction against the transaction. Because he believes that BHC's public shareholders could not have enjoined the merger, he concludes that the district court's instruction to the jury that they could have obtained an injunction under Nevada law constitutes reversible error.

We disagree. His ⁺est for materiality has little merit under 15 U.S.C. § 78j(b) and no merit under 18 U.S.C. § 1341.

### 1. *15 U.S.C. § 78j(b)*

Section 10 of the Securities Exchange Act of 1934 (now codified in 15 U.S.C. § 78j) states in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5(b) prohibits making "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstance under which they were made, not misleading." 17 C.F.R. § 240.-10b–5(b).

### a. *The Test for Materiality*

■ Margala quotes isolated passages from *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273 (9th Cir. 1979), that seem to say that whether a fact is material for Rule 10b–5(b) purposes turns on the availability of a state injunction. Upon careful examination, however, it is clear that they do not.

The minority shareholders in *Santa Fe*, like those in the instant appeal, were allegedly frozen out of a corporation and inadequately compensated for their stock. Although there was ample evidence of full disclosure, the Supreme Court discussed in a footnote whether "the majority shareholder's failure to give the minority advance notice of the merger was a material nondisclosure." 430 U.S. at 474, n.14, 97 S.Ct. at 1301. The Court concluded in that footnote:

[R]espondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. *Cf. TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 [96 S.Ct. 2126, 48 L.Ed.2d 757] (1976).

*Kidwell* involved the sale of a corporation's assets. Some of the corporate officers who approved the sale concealed their conflicts of interest. We held that this nondisclosure was material under Rule 10b–5(b) because a reasonable shareholder would have considered the information important in deciding whether to exercise his right to block the sale under state law. 597 F.2d at 1293. We explained:

Thus, contrary to the arguments of the defendants in this case, there is room for

Rule 10b–5 liability after *Santa Fe Industries* even when the only deceived parties are shareholders who are not entitled to vote on the transaction in question, and even though there may be a breach of fiduciary duty under state law. Indeed, under the *Goldberg* [*v. Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978),] rationale, it is precisely because there are state-law remedies for the shareholders that a deception can be found. Inadequate disclosures lull into security those shareholders who might bring derivative actions under state law to enjoin the securities transactions if all material facts were revealed.

597 F.2d at 1292.

Margala's interpretation of these quotations relies on a single principle: the preeminence of state law in securities cases. He reasons that a fact is material under Rule 10b–5(b) only when it is important to the state, and that a fact is sufficiently important only when it would support a successful state claim for an injunction.

▪ We reject this reading because it rests on two faulty premises. First, it misconstrues the role of state law. The Supreme Court "repeatedly has described the 'fundamental purpose' of the [Securities Exchange Act of 1934] as implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 477–78, 97 S.Ct. at 1302–1303. Thus while state law governs most facets of securities transactions, federal law controls disclosure.

▪ Second, this reading misconstrues the test for a material fact. A fact is material when there is a substantial likelihood that a reasonable investor would view its disclosure "as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The importance of the fact to the state is not relevant in itself and is a poor measure of the importance of the fact to the investor.

▪ We read *Santa Fe* and *Kidwell* to support a different, commonsense proposition about materiality: A reasonable investor will not view a fact as significant unless he could respond to the fact's disclosure by protecting himself from possible financial loss.[1] There is little reason to require disclosure when an investor could not use the information. The courts in *Santa Fe* and *Kidwell* simply recognized that facts may be useful and, consequently, material when an investor can obtain a state injunction against the proposed transaction.

b. *Satisfying the Materiality Test*

▪ The issue before us is whether BHC's public shareholders could have protected themselves from financial loss had they known the facts underlying the plan to freeze them out that ultimately culminated in a forced sale of their stock.[2] An investor can protect himself in other ways than by enjoining the transaction. In *Kidwell,* for example, we recognized that aggrieved shareholders may have the power to vote down the transaction. 597 F.2d at 1292. In this case, BHC's public shareholders might have sold their stock before the freeze-out at a higher price. Another possibility is that they could have exposed the plan and forced Margala and the others to abort it. The record is clear that the scheme relied on deception and that exposure would have led to adverse publicity, civil actions, and state and federal

---

1. Other courts of appeals have also reasoned to this conclusion. *See Securities and Exchange Commission v. Blatt*, 583 F.2d 1325, 1331–32 (5th Cir. 1978) ("*Santa Fe* does not control a case in which information that would prove useful to investors is withheld"); *Wright v. Heizer Corp.*, 560 F.2d 236, 250 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978) ("If these shareholders would have been powerless to prevent the proposed self-dealing by the controlling shareholder even if they had possessed knowledge of all the facts, the failure to disclose to them would presumably be immaterial and reliance could not be shown").

2. The corporation eliminated fractional shares after a 10 to 1 reverse stock split, and later engineered a merger by which the minority

prosecutions. A reasonable BHC shareholder would have successfully protected himself from financial loss by one or both of these means.

### 2. 18 U.S.C. § 1341

Margala disputes his conviction for mail fraud under 18 U.S.C. § 1341 on the same ground. Because he was convicted under 18 U.S.C. § 1341 and 15 U.S.C. § 78j(b) for misconduct in the same scheme, he contends that § 78j(b)'s state injunction requirement also limits the application of § 1341.

This argument is frivolous. First, Margala does not explain how § 1341 could derive a state injunction requirement from § 78j(b). And second, § 78j(b) is not the source of a state injunction requirement.

### C. *Venue*

Margala also argues that the district court improperly denied his motion for change of venue. He has not, however, shown that this denial prejudiced his defense. Thus we need not rule whether the district court acted properly.

### III. *The Conditions on Probation*

■ The sentencing judge has the power under 18 U.S.C. § 3651 to grant probation "when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby." That section also states:

> While on probation and among the conditions thereof, the defendant—
>
> May be required to pay a fine in one or several sums; and
>
> May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had
> . . . .

The district judge exercised his authority under § 3651 to grant probation on the condition that Margala

> shall forfeit any retirement pension benefits that he may have acquired during the course of his business with the corporation, he shall surrender all stocks ac-

quired during the course of his employment as an officer and director, and that the corporation, to whom he's indebted, shall cancel the loan for which he's obligated . . . .

■ Margala contends that the conditions are purely punitive and, consequently, that this court should remove them. These conditions are not improper so long as they are "reasonably related" to the rehabilitative purpose of § 3651. *See Higdon v. United States*, 627 F.2d 893, 898–900 (9th Cir. 1980); *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 263–64 (9th Cir. 1975). We will normally defer to the sentencing judge because this test "must be, as the Act indicates, a very flexible standard. Nor could it be otherwise in light of our uncertainty about how rehabilitation is accomplished." *Id.* at 264. In this case, we are unable to say that the conditions do not serve a rehabilitative purpose. Margala acquired his pension rights and the stock in question long after the scheme to defraud the public shareholders was set in motion. The sentencing judge may have decided, for example, that it would be therapeutic for Margala to sever remaining ties with BHC.

Margala also claims that the imposition of these conditions will exhaust his savings. "If the impact of the conditions is needlessly harsh, the conditions are impermissible." *Higdon v. United States*, 627 F.2d at 898. But Margala fails to show that he would be ruined or that the harshness of the conditions is not justified by their rehabilitative effect.

### IV. *Conclusion*

We affirm Margala's convictions under 15 U.S.C. § 78j and 18 U.S.C. § 1341, and the imposition of the conditions on his probation.

shareholders were forced to exchange their stock for stock in another corporation, thus satisfying the § 10(b) requirement that the

nondisclosure or manipulation be "in connection with the purchase or sale of any security . . ."