**Roy Lee WILLIAMS, Petitioner,**

v.

**C.A. TURNER, Warden, United States Medical Center for Federal Prisoners, Springfield, Missouri, et al., Respondents.**

**No. 87–3066–CV–S–WRC.**

United States District Court, W.D. Missouri, S.D.

Aug. 26, 1988.

See also 737 F.2d 594.

F. Russell Millin, Millin, Trader & Jackson, Bruce Houdek, Kansas City, Mo., for petitioner.

Michael A. Jones, Asst. U.S. Atty., Springfield, Mo., for respondents.

## ORDER

COLLINSON, Senior District Judge.

Petitioner, an inmate confined in the United States Medical Center for Federal Prisoners (MCFP), petitions this Court for a writ of habeas corpus in which he challenges the decision of the United States Parole Commission requiring him to remain in confinement for 80 months when his guidelines call for release after service of 24–36 months. The petition, by order of this Court entered February 3, 1987, was referred to the Honorable James C. England, United States Magistrate, for preliminary review under 28 U.S.C. § 636(b) and Local Rule 22.

After considering the pleadings of both the petitioner and the government, as well as his own research, the Magistrate recommended to this Court that the petition for a writ of habeas corpus be dismissed. Petitioner timely filed his objections to the Magistrate's recommendation. The entire question is now before this Court, ripe for ruling.[1]

## I. STATEMENT OF FACTS

On December 15, 1982, the petitioner, Roy Lee Williams, was found guilty on all eleven counts[2] of which he was charged of conspiracy to bribe a United States Senator[3] and defrauding the Teamsters' Central States Pension Fund. The illegal conduct occurred while Mr. Williams was International Vice–President of the Teamsters Union as well as Director of the Central Conference of Teamsters. At the time of his conviction, Williams was the General President of the International Brotherhood of Teamsters having succeeded Frank Fitzsimmons. Judge Prentice H. Marshall set the sentencing of Mr. Williams and his four co-defendants for February 10, 1983.[4]

Williams' presentence report was prepared by a United States Probation Officer[5] and submitted to Judge Marshall on February 3, 1983. The report estimated Williams' Salient Factor Score at "10" (very good) and his Offense Severity at "Category 5" (very high). The officer's Parole Prognosis predicted that Williams would be required to serve 24 to 36 months, according to United States Parole Commission Guidelines. The report added, "[h]owever, especially mitigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed."

On March 31, 1983, Judge Marshall concluded petitioner's unusually long sentencing hearing, a hearing which had commenced February 7, 1983,[6] by directing that Mr. Williams be sentenced to terms totaling fifty-five (55) years in prison, pursuant to § 4205(c) of the United States Criminal Code. The Court directed that petitioner be incarcerated at the MCFP on or before April 15, 1983 and that the MCFP return him to the Court on June 27, 1983 and report, pursuant to § 4205(c) and § 4205(d), on Mr. Williams' health and the

---

1. Pursuant to Rule 8(a) of the rules governing 28 U.S.C. § 2255 proceedings, the Court has reviewed the petitioner's motion, the government's response thereto, and all subsequently filed pleadings, including the Report and Recommendation of the United States Magistrate, and finds that an evidentiary hearing is not required. In this case, the essential facts concerning petitioner's compelled testimony and the Parole Commission proceedings are not in dispute. We therefore decide the instant motion on the basis of the record at hand and the parties' memoranda. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963).

2. 18 U.S.C. § 371 (Count 1); § 1952 (Count 2); and § 1343 (Counts 3 through 11).

3. Senator Howard W. Cannon (D.Nev.).

4. *United States of America v. Roy L. Williams, et al.,* United States District Court for the Northern District of Illinois, Eastern Division, No. 81–CR–269.

5. Barry J. Rankin.

6. Records indicated that the official transcript from that hearing consisted of 2,971 pages.

ability of the facility to manage him. His bond was continued.

On August 19, 1985, Mr. Williams was given his final sentence by Judge Marshall pursuant to 18 U.S.C. § 4205 of a term of ten (10) years in prison. He came into custody on December 3, 1985, and is currently incarcerated, as he has been, at the MCFP.

The judgment entered by the trial court was affirmed on appeal. As of the date Mr. Williams' petition for a writ of habeas corpus was filed, no petitions or other proceedings challenging the validity of that conviction had been filed. Petitioner did, however, file a timely Motion for Reduction of Sentence which was denied by the sentencing court.

On April 4, 1985, the United States Department of Justice granted authority to the President's Commission on Organized Crime (PCOC) to issue an Order to petitioner to give testimony pursuant to 18 U.S.C. §§ 6002–6004. Thereafter, on May 4, 1985, the PCOC issued its Order to petitioner directing him to testify before it and ordering that "no testimony or other information compelled [by the Order], or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case...." [7]

On October 3, 1985, the United States Department of Justice gave approval for a request for court-ordered testimony, likewise pursuant to §§ 6002–6004. Thereafter, the United States Attorney for the Western District of Missouri filed his motion to compel testimony (of the petitioner) in the matter of *United States of America v. DeLuna, et al.* [8] The District Court granted that motion on October 25, 1985 and entered its order directing petitioner to testify and further providing that "testimony given pursuant to this immunity or evidence derived therefrom shall not be used against the witness in any criminal proceeding ..." [9]

By all accounts, Mr. Williams' testimony was instrumental in gaining important convictions in the *DeLuna* case and likewise proved to be of great value to the PCOC. Petitioner's cooperation and testimony were apparently significant in that the Government's conspiracy theory regarding the link between the Teamster Union and the Mafia was provided and/or substantiated by his direct testimony. To date, Mr. Williams is apparently the highest ranking official to openly provide a clear link between the Teamsters and Mafia activity. He was able to tie together the Mafia families from Kansas City, Milwaukee, Chicago, and Cleveland with his knowledge and testimony. No parties contest the value to the Government of Mr. Williams' cooperation and testimony.

Mr. Williams was given an initial parole determination hearing on May 12, 1986. The examiner panel split on its recommendation. One examiner, Mr. Gary Gray, recommended that Mr. Williams be paroled after service of 36 months, the maximum within his 24–36 month guidelines. The other, Mr. Gary Lasley, recommended that he be required to serve to the expiration of his sentence (approximately 80 months). Finally, the panel recommended that the case be referred for original jurisdiction consideration by the Regional Commissioner, Carol Pavilack Getty. She, in turn, referred the matter to the National Commissioners for Original Jurisdiction consideration.

On July 15, 1986, the National Commissioners issued their decision concerning petitioner's Application for Parole and served upon Williams its Notice of Action which reaffirmed petitioner's offense severity rating, salient factor score, and the previously mentioned release guidelines of twenty-four (24) to thirty-six (36) months to be served. However, respondent thereafter ruled as follows:

---

7. *See* Exhibit F to Mr. Williams' Petition for Writ of Habeas Corpus, D.O.C. # 1.

8. United States District Court for the Western District of Missouri, Western Division, No. 83– 00124–01/15–CR–W–8. Also referred to as the "Argent" case.

9. Exhibit D to Mr. Williams' Petition.

After review of all relevant factors and information presented, a decision above the guidelines appears warranted because your offense behavior involved the following aggravating factors: while involved in the management of the Teamsters Union, you were working at the discretion of the La Cosa Nostra, Nick Civella especially, involving the granting of loans made by the Teamsters Pension Fund to La Cosa Nostra sponsored endeavors.

The petitioner alleges that the facts and matters relied upon by the Commission as justification for denying Williams parole and making a release decision above its own guidelines were in fact provided to the Commission by petitioner's own compelled testimony before the United States District Court for the Western District of Missouri and the President's Commission on Organized Crime.

The petitioner further alleges that "[o]ther than the petitioner's own testimony, respondent has cited no other evidence upon which it purports to rely to justify its decision above its own guidelines and deny petitioner any parole."

Mr. Williams filed an appeal from the July 15, 1986 ruling of the Commission to the full Parole Commission which on January 20, 1987, affirmed the earlier ruling.

Again, the petitioner argues that the use of his own compelled testimony to "increase" his period of confinement from what it would "normally" be constitutes a violation of his rights under the fifth amendment to the Constitution and/or the provisions of 18 U.S.C. §§ 6001–6005 (and possibly § 4206(c)), is fundamentally unfair, is arbitrary and capricious constituting an abuse of discretion, and generally violates Williams' rights to due process and equal protection under the law.

## II.

Simply stated, the issues to be considered by this Court can be boiled down to a two-part inquiry: (1) Did the Parole Commission use evidence gained, directly or indirectly, from compelled testimony to enhance Mr. Williams' time to be served?, and if so, (2) is this permissible under the fifth amendment and/or applicable statutory law.

In his Report and Recommendation to this Court issued February 4, 1988, Judge England answered both questions in the affirmative. With regard to the threshold question, he noted the great weight given by the Parole Commission to the information that became available to it as a result of Mr. Williams' compelled testimony. "It would be a fiction to accept respondents' argument that the compelled testimony was only corroborative and that a sufficient independent basis existed for the findings." *Report and Recommendation,* dated February 4, 1988, p. 3. However, petitioner argues that, while Judge England is correct in determining that the Parole Commission chiefly relied on the compelled testimony to justify going above the guidelines, Judge England was incorrect in his analysis of the law as to whether said conduct by the Parole Commission was permissible. The respondent, on the other hand, disagrees with Judge England's affirmative answer as to the threshold question but obviously agrees with his result, *i.e.* defendant says, even assuming for the sake of argument that there was no independent basis on which to justify going above the guidelines other than the information gleaned from the compelled testimony, the Commission was legally within its rights to go above the guidelines.

For reasons set out more fully below, the Court finds that the Parole Commission relied heavily and primarily on Roy Lee Williams' compelled testimony and other evidence derived from that compelled testimony in order to enhance Williams' presumed parole date, that the portion of the presentence report alleging Williams was involved in organized crime was explicitly disavowed by Judge Marshall at the time of sentencing, and that but for considering said evidence, there was not sufficient other evidence for the Commission to find independent justification for increasing Williams' presumed parole date. The Court will therefore direct the Parole Commission to reevaluate petitioner's presumed

parole in a manner consistent with this opinion within 28 days. In the event of non-compliance, the Court will grant the writ of habeas corpus and order the prisoner discharged from custody.

### III.

■ The Court will first consider the question of whether the Parole Commission primarily depended on the information gained from the compelled testimony as its basis for going above the sentencing guidelines with regard to Mr. Williams.

As mentioned above, Williams had his initial parole determination hearing on May 12, 1986. The record before the Commission included his presentence report dated January 26, 1983, the indictment, the government's summation of the trial evidence, Williams' deposition for the PCOC, a transcript of Williams' testimony (along with that of two other witnesses) in the *DeLuna* case, and various letters concerning Williams' cooperation. However, the Court has no difficulty in finding that the Commission would not have recommended going above the guidelines but for the information gleaned from Williams' compelled testimony.

On page 3 of the Pre–Hearing Assessment Form, under "IV", specific reference is made to petitioner's compelled testimony and its contents:

Subject was on appeal bond and service of the sentence was delayed from the original sentencing date of 02/10/83 until commencement of the term on 05/21/85. During this period of time subject in late 1985 testified in U.S. District Court, Western District of Missouri in the trial of nine (9) individuals with ties to Organized Crime accused of skimming two million dollars from Las Vegas Casino proceeds. The file would reflect that during the subject's testimony he admitted receiving some $1,500 per month for some 7 years as a result of his help in arranging loans from the Central

States Pension Fund to purchase one or more gambling casinos in Las Vegas, Nevada.

*Pre–Hearing Assessment,* p. 3, attached as Exhibit One to respondents' Response to Order to Show Cause, filed February 24, 1987. (D.O.C. # 4)

Below is an excerpt from one of the reports of the commissioners:

With regard to subject's behavior related to the conviction for attempted bribery of a U.S. Senator as well as the related attempted fraud, the offense severity is rated as Category Five and the guideline range is 24–36 months. *As a result of the recent "Argent"* [10] *case and subject's testimony in this case, the behavior leading to his conviction in 1982 is almost over-shadowed by these additional revelations.*

Subject would yet tend to minimize his involvement in the attempted bribery of Senator Cannon for the purpose of delaying or obtaining a favorable consideration on legislation affecting the trucking industry.

It is evident that there exists some most aggravating factors in this case. *As a result of subject's testimony and cooperation it was learned* that there existed a corrupt relationship between leaders of the Teamsters and Organized Crime ...

*Initial Hearing Summary,* p. 4, Report of Examiners Gray and Lasley.[11] (Emphasis added). Also:

Examiner Lasley's recommendation for CTE is based on the fact that subject admittedly performed his duties as Vice President of the Teamsters Union at the direction of Nick Civella, and was instrumental in making loans by the Teamsters Pension Fund to finance La Cosa Nostra endeavors ... Subject ... operated under the influence of Organized Crime.

*Regional Commissioner Evaluation,* p. 1, submitted by Carol P. Getty, NCRO.[12]

---

**10.** *U.S. v. DeLuna et al.,* U.S.Dist.Ct., W.D.Mo., W.D., No. 83–00124–CR–W–8.

**11.** Attached as Exhibit Two to defendant's Response to Order to Show Cause, filed February 24, 1987. (D.O.C. # 4)

**12.** Attached as Exhibit Four.

Likewise, the aggravating factors cited by the National Commission as justification for going above the guidelines refer specifically to information that was detailed in Williams' previously given compelled testimony, to-wit:

> ... [Y]ou were working at the discretion of the La Cosa Nostra, Nick Civella especially, involving the granting of loans made by the Teamsters Pension Fund to La Cosa Nostra sponsored endeavors.

*Decision of the National Commissioners on Original Jurisdiction Referral,* p. 2, dated July 15, 1986.[13]

Finally, the Commission eventually conceded that "[it] does not disagree that the compelled testimony was indeed *a significant factor in its decision to go above the guidelines.*" *Respondents' Response to Petitioner's Objections to Report and Recommendation,* p. 3, filed March 7, 1988 (emphasis added). The Court agrees and further concludes that not only was this information "a significant factor in its decision," but that the most reasonable inference to make from the Commission's own actions and statements was that it was the *primary* factor in its decision.

## IV.

The Court next considers the question of whether the Commission's use of evidence gained from Mr. Williams' compelled testimony is permissible under the fifth amendment and/or applicable statutory law for the purpose of justifying going above the guidelines.

The government's power to compel people to testify, whether in court, before grand juries, or before other governmental agencies, is one firmly established in Anglo–American jurisprudence. "The power with respect to courts was established by statute in England as early as 1562 ..."[14] *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The power to compel testimony and the corre-

sponding duty to testify are recognized in the sixth amendment and the Judiciary Act of 1789. *Kastigar,* 406 U.S. at 443–444, 92 S.Ct. at 1655–56. "Such testimony constitutes one of the Government's primary sources of information." *Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 93–94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964).

However, this power of the government to compel is tempered by, among other things, a citizen's fifth amendment privilege against self-incrimination. One of our most sacred civil liberties, it has been described as "one of the great landmarks in man's struggle to make himself civilized."[15]

These two important interests were recognized as being at loggerheads even before the birth of the Republic. To solve the problem of accommodating both interests, immunity statutes were adopted. It was not long after the protection against self-incrimination had gained its place in the law that it was recognized that the privilege was not applicable when immunity, or "indemnity," in the English usage, had been granted. For example, an Act of Parliament passed in 1710 directed against illegal gambling, which granted immunity to certain individuals involved in such activity if they would return their winnings to the loser, became the model for an identical immunity statute enacted in 1774 by the Colonial Legislature of New York. 9 Anne, c. 14, §§ 3–4, (1710); Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York, 621, 623 (1894).

"Immunity statutes ... are not incompatible with [the privilege against self-incrimination]. Rather, they seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar,* 406 U.S. at 445–446, 92 S.Ct. at 1657. In fact, such statutes have "become part of our constitutional fabric." *Ullman,* 350 U.S. at 438, 76 S.Ct. at 506.

---

**13.** Attached as Exhibit Five.

**14.** Statute of Elizabeth, 5 Eliz. 1, c. 9, § 12 (1562).

**15.** Mr. Justice Frankfurter quoting Griswold, *The Fifth Amendment Today* (1955), 7, in *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956).

The immunity statutes involved in the matter at bar are found in 18 U.S.C. §§ 6001–6004. The petitioner points out that the legislative history of these statutes indicates that Congress contemplated that the statutes would enable effective displacement of the privilege against self-incrimination by granting protection co-extensive with the privilege. In *Kastigar, supra,* where the constitutionality of the statutes was tested, the Supreme Court said that "a grant of immunity must afford protection commensurate with that afforded by the privilege ..." and found that the statutes' granting of immunity from use and derivative use of compelled testimony was coextensive with the scope of the privilege against self-incrimination. Petitioner essentially argues that, in order for the grant of immunity to actually be "coextensive," evidence from Mr. Williams' compelled testimony cannot and should not be used to justify requiring him to serve more time in prison than what he otherwise would have but for his compelled testimony, *i.e.* going above the sentencing guidelines. The respondent counters by pleading that use of the information by the Parole Commission in a parole determination hearing is permitted by the language of the statute.

To limit this Court's inquiry to whether consideration of such information is or is not allowed by the specific language of the statute presupposes that the statute was written broadly enough to pass constitutional muster. This may or may not be true. Legislative bodies have frequently passed statutes that did not give full honors to constitutionally protected rights. Thus if use of Williams' statements made under compulsion should have been deemed worthy of fifth amendment privilege with regard to the Parole Commission's consideration of same, then any applicable immunity statute would have to be either read as implicitly giving "protection commensurate with that afforded by the privilege," or else deemed unconstitutional as applied. This is simply another way of saying that a statute cannot limit your rights guaranteed you by the Constitution, it cannot "grant" you less than what you have already been granted by the Constitution. Therefore, the Court must consider whether the fifth amendment protects one from the type of "retribution" from the Parole Commission complained of here.

The fifth amendment commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." This protection is not limited to simply the prosecution of criminal cases. "The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 581–582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961)) (emphasis added by the *Estelle* Court). Thus, the Supreme Court has recognized that not only is the government prohibited from using a person's compelled testimony in an effort to convict him, it is also improper to use it when fixing his punishment. In *Estelle,* the Court granted certiorari to consider whether the prosecution's use of psychiatric testimony at the sentencing phase of a bifurcated capital murder trial (to decide whether the death penalty should be imposed) violated the defendant's constitutional rights. After the defendant had already been convicted, testimony of a psychiatrist who had been directed by the Court to evaluate the defendant's competency to stand trial was offered. The psychiatrist had not testified at the first phase of the trial. Evidence of the doctor's interview with the defendant was admitted by the trial court over defense counsel's objection. The Supreme Court overturned the death sentence, holding that the evidence was improperly admitted in derogation of the defendant's rights guaranteed by the fifth amendment.

From the *Estelle* opinion:

The Fifth Amendment privilege is "as broad as the mischief against which it seeks to guard," *Counselman v. Hitchcock,* 142 U.S. 547, 562 [12 S.Ct. 195, 198,

35 L.Ed. 1110] (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8 [84 S.Ct. 1489, 1493, 12 L.Ed.2d 653] (1964). *Estelle,* 451 U.S. at 467–468, 101 S.Ct. at 1875.

■ However, does one whose presumed parole date is pushed beyond that recommended by the sentencing guidelines, due to consideration of compelled testimony, "suffer no penalty"? The respondents maintain that no penalty is suffered since the Commission's actions "did not result in a new sentence or an enhanced sentence; petitioner's sentence remained ten years." *Respondents' Response to Petitioner's Objections to Report and Recommendation,* p. 2. The petitioner states that such reasoning places form before substance because though "the mathematical term of petitioner's sentence (10 years) is not lengthened, the term of confinement is clearly lengthened." *Petitioner's Objections to Report and Recommendation,* p. 4.

The Court concludes that a penalty is suffered because a liberty interest is involved. A substantial liberty from legal restraint is at stake any time the government makes decisions regarding parole or probation. Liberty from bodily restraint always has been recognized as the core of the liberty protected by the due process clause from arbitrary governmental action. *Ingraham v. Wright,* 430 U.S. 651, 673–674, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972). The Court believes that Supreme Court decisions seem to support the conclusion that criminal offenders have a liberty interest in securing parole release. In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, the Court held that all persons released on parole possess an interest in remaining free from incarceration. Similarly, in *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656

(1973), the Court held that individuals on probation also retain a liberty interest which cannot be terminated without due process. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) the Court found that the state had created "a right to a shortened prison sentence through the accumulation of credits for good behavior," *id.,* at 557, 94 S.Ct. at 2975, which had thereby created a liberty interest that could be terminated only for "serious misbehavior." The Court fails to see how any less of a liberty interest could be involved in the context of parole release decisions as opposed to parole revocation decisions. "Whether an individual currently enjoys a particular freedom has no bearing on whether he possesses a protected interest in securing and maintaining that liberty. The Court acknowledged as much in *Wolff v. McDonnell, supra,* when it held that the loss of good-time credits implicates a liberty interest even though the forfeiture only deprived the prisoner of freedom he expected to obtain sometime hence." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 26, 99 S.Ct. 2100, 2113, 60 L.Ed.2d 668 (1979) (Marshall, J. dissenting). "Whether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration." *United States ex rel. Johnson v. Chairman of New York State Board of Parole,* 500 F.2d 925, 928 (2d Cir.1974), vacated as moot *sub nom. Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

Today the Court does not state that the Constitution requires the government to provide for any sort of parole system at all. "But when a State adopts a parole system that applies general standards of eligibility, prisoners justifiably expect that parole will be granted fairly and according to law whenever those standards are met. This is so whether the governing statute states ... that parole 'shall' be granted unless certain conditions exist, or provides some other standard for making the parole decision." *Greenholtz,* 442 U.S. at 19, 99 S.Ct. at 2110 (Powell, J., concurring in part and dissenting in part).

In entertaining the question of whether federal parole statutes create substantial

expectancy of parole and therefore involve constitutionally protected liberty interests, the Eighth Circuit discussed the Supreme Court's decision in *Greenholtz:*

> *Greenholtz* was a class action under 42 U.S.C. § 1983 brought by the inmates of the Nebraska Penal and Correctional Complex. The inmates claimed, *inter alia,* that they had been unconstitutionally denied parole without procedural due process. 442 U.S. at 3–4, 99 S.Ct. at 2102. After an examination of the "unique structure and language" of the Nebraska parole statutes, the Supreme Court concluded that the statutory requirements did create a liberty interest, that is, an expectancy of release, that was entitled to the protection of due process. *Id.* at 12 [99 S.Ct. at 2106]. Thus, the more complete lesson of *Greenholtz* is that, *though there is no inherent right to parole, a limited right to parole may be provided by applicable statutes.* The question in each case must turn on a careful examination of the particular statutes and regulations governing parole in a given jurisdiction.

*Evans v. Dillahunty,* 662 F.2d 522, 524 (8th Cir.1981).

The Court of Appeals then undertook an analysis of the relevant federal parole statutes. After noting that "not every expectation ... gives rise to a protectable interest" the Court hastened to add "[b]ut when one can show that the decisionmaker is required to base its decisions on specific, defined criteria, a protectable interest is created that is entitled to some degree of due-process protection. *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465–66, 69 L.Ed. 2d 158 (1981) (Brennan, J., concurring)." *Evans,* at 525.

The statute most relevant here, 18 U.S.C. § 4206, provides in part:

> (a) If an eligible prisoner has substantially observed the rules of the institution ... and if the Commission ... determines:
>
> > (1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

> > (2) that release would not jeopardize the public welfare subject to the ... guidelines promulgated by the Commission ..., such prisoner *shall be released.*

18 U.S.C. § 4206(a) (emphasis added).

After noting that the Commission's guidelines are "somewhat like the ones contained in the Nebraska parole statute considered in *Greenholtz,*" the Court of Appeals continued:

> Although the Court in *Greenholtz* did not examine the Nebraska guidelines extensively, we mention them here in order to make an important point. The exercise of discretion under the federal statute is more limited than that exercisable under the Nebraska scheme. While the Board in Nebraska is free to consider any other factors it deems relevant, the federal Parole Commission cannot deviate from the guidelines contained in 28 C.F.R. § 2.20 unless it "determines there is good cause for so doing: *Provided,* That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied on." 18 U.S.C. § 4206(c). When one considers this specific limitation on the Commission's exercise of discretion and the presence of the mandatory word, "shall," the conclusion that the federal parole statute creates a substantial expectancy of parole follows.

*Evans,* 662 F.2d at 526. We agree and therefore find that Mr. Williams has a liberty interest involved with regard to a presumed parole release date.

 Having found that a liberty interest exists, the Court has little hesitation in finding that that interest is protected by the fifth amendment's insurance of due process and its protection against compelled self-incrimination. Respondents would make much of the fact that the decision-making process of the Commission is not a criminal proceeding as such, so the exposure that Williams risks is not deserving of coverage by the fifth amendment's protection. But the Supreme Court has held that "the availability of the [fifth

amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission *and the exposure which it invites." In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967) (emphasis added). Certainly, the Supreme Court has previously found that the privilege exists in situations other than criminal prosecutions. *See, e.g. Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (disbarment proceeding); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (public employee's protection from dismissal for exercising fifth amendment rights); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (protection from having governmental contracts cancelled); *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (political party officer protected from removal from his position and being barred from holding office simply for exercising constitutional privilege). Regarding the 'invited exposure,' compelling Williams' testimony clearly required him to divulge information which compromised the liberty interest just discussed. The Court therefore finds that, in order for the petitioner to be in substantially the same position as if he had been allowed to claim his privilege, we must read the applicable immunity statutes broadly enough to include a bar against the Commission from utilizing compelled testimony as justification for going above its own guidelines. This is the only way that the immunity granted under the statute can be truly coextensive with the scope of the privilege.

To hold otherwise "would allow one arm of the Government—the Parole Commission—to increase a defendant's period of incarceration when another arm of the Government—the United States Attorney's office—could not do so through the prosecution of additional criminal charges." *Davis v. United States,* 649 F.Supp. 754, 759 (C.D.Ill.1986).

In *Davis,* the petitioner alleged that the Commission violated the terms of his plea agreement by using information concerning his prior cocaine distribution—disclosed to the government pursuant to Davis' promise of cooperation—in its determination of his eligibility for parole. The judge hearing the petition looked beyond a strict reading of the plea agreement, which only specifically spoke of immunity from future prosecutions, and instead ruled that fundamental principles of fairness should not allow the government to get in through the back door when it clearly cannot through the front.

▪ Though the case before the Court today is distinguishable in that no plea agreement was entered into, it seems that the same quitable considerations should apply. The Court therefore holds that the Commission's use of information not available for use by the prosecution because of a grant of immunity and the accompanying order compelling testimony, for the purpose of going above the sentencing guidelines, is a violation of the spirit of the due process clause and the self-incrimination clause of the fifth amendment. This includes not only Williams' compelled testimony, but also admissions made before the Commission that obviously would not have been made had Williams' compelled testimony not been available to the Commission.

## V.

▪ The Court will also address the question of to what extent, if any, the Commission should have relied on certain portions of the presentence investigation report (PSI) as justification for going above the sentencing guidelines. Respondents have taken the position that, even if the Commission had not considered information gleaned from petitioner's compelled testimony, there was an independent basis for justifying going above the guidelines. "When classifying offenses for parole eligibility purposes, the Commission can rely on information contained in a PSI *that has not been disavowed by the sentencing court. Melvin v. Petrovsky,* 720 F.2d 9, 11 (8th Cir.1983)." *Montgomery v. United States Parole Commission,* 838 F.2d 299, 301 (8th Cir.1988) (emphasis added). Of

course, then the reverse must be true, *i.e.* where the information contained in the PSI *has* been disavowed, it may *not* be relied on by the Commission. The question thus becomes whether any portion of the PSI was disavowed by the sentencing court, Judge Marshall.

The PSI prepared in the *Williams* case contained, among other things, allegations that Williams was associated with and controlled by organized criminal elements. Regarding those allegations, below are set out excerpts of Judge Marshall's comments at the sentencing hearing of Williams and his co-defendants:

Now, we have reached the point in the due process which attends sentencing where particularly defendants can challenge the presentence report and can be heard. (Transcript of sentencing hearing, p. 2941)

\* \* \* \* \* \*

I think that the two offenses, the two distinct offenses of which these defendants [Williams and Jospeh Lombardo] have been convicted, conspiracy to bribe a United States Senator and engaging in a scheme to defraud a pension and welfare fund—I believe those two offenses are of sufficient gravity to warrant substantial punishment.

\* \* \* \* \* \*

But in light of the allegations of the Government, and in light of the hearing that we have held, there is another aspect of this case that I think we have to touch upon. The Government alleges that Mr. Lombardo and Mr. Williams have organized crime connections, that their connections with organized crime warrant the enhancement of their punishment.

And so we have been here now for the better part of four trial weeks hearing evidence with respect primarily to organized crime but, secondarily, some evidence with respect to Mr. Lombardo as a person. (Transcript, pp. 2952–53).

Judge Marshall then discussed the evidence concerning defendant Lombardo and, at page 2961 of the transcript, found that Lombardo was an active functionary in organized crime in Chicago.

In contrast, at page 2962 of the transcript, Judge Marshall discussed the proof concerning petitioner and stated as follows:

As far as Mr. Williams is concerned, I think the proof is more tenuous. The proof is largely hearsay. There are no self-incriminatory declarations from Mr. Williams. There are discussions among Civella and Lombardo and Dorfman with regard to Williams or Roy. There is the meeting that Williams attended, attended by Civella.

In the case of Mr. Williams, I think that there is a great risk that he would truly be castigated by a device that I think most thinking people scorned back in the '50's. We called it guilt by association, and we said we would never tolerate that. Oh, we had tolerated it in prior times in our history, and Mr. Oliver urges that we are tolerating it now. But there is that risk, there is that gnawing uncertainty that I have about Mr. Williams.

The proof with respect to Mr. Williams vis-a-vis any—any connection, any business type connection with organized crime is tenuous, it is not clear and unequivocal and convincing.

Judge Marshall then proceeded to sentence petitioner and discussed the factors that he was taking into consideration when passing sentence (Tr. 2963–67). However, he did not mention any connection with organized crime. Rather, he emphasized that the crimes for which he had been charged and connected, in and of themselves, constituted a serious enough basis for sentencing Mr. Williams to the sentence that was received:

I am convinced beyond any doubt that he conspired to corrupt Senator Cannon. I am convinced beyond any doubt that he knowingly and intentionally permitted the Pension Fund assets to be used for that purpose. (Tr. 2963).

After carefully examining the transcript, this Court concludes that Judge Marshall, based on what he knew at the time, disavowed the government claim contained in

the presentence report that petitioner was a member and participant of organized crime.

In a letter to the Parole Commission from David Margolis, Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice, which was attached as Exhibit A to respondent's May 25, 1988 suggestions, Mr. Margolis seemed to concede that Judge Marshall was not impressed with the evidence offered by the government against Mr. Williams in the prolonged sentencing hearing as he was with the evidence offered against Mr. Lombardo:

> At the time [of sentencing], the presiding trial judge ... ruled that the government's evidence was insufficient to prove Williams' relationship to organized crime. However, Judge Marshall accepted the government's evidence that Williams' codefendant, Joseph Lombardo, was a leader of the Chicago [Mafia family].

As this Court has concluded that the aforementioned assertions regarding Mr. Williams in the PSI were disavowed by the sentencing judge, the Court rules that the Commission should not have relied on that information contained in the PSI as part of its justification for going above the sentencing guidelines. Furthermore, on remand the Parole Commission is to make its re-evaluation without considering same.

## VI.

In summary, today the Court has found that the Parole Commission, by its own admission, relied to a large degree on statements made by Mr. Williams in Court and in front of a Presidential Commission after he was compelled to testify. We have further found that, since the law requires that a grant of immunity to someone being compelled to testify must be broad enough to be considered "coextensive" with the scope of one's fifth amendment privilege, it is impermissible to use the information gleaned from the compelled testimony to set a parole date above what the Commission's own guidelines would normally call for.

The Court has further found that the presentence investigation report prepared for Mr. Williams case was disavowed by the sentencing judge and therefore should not have been considered by the Parole Commission. Furthermore, since Mr. Williams obviously made statements before the Commission that would not have been made but for the fact that the two aforementioned sources of information were already available to the Commission, then information from some of Mr. Williams' own admissions was essentially evidence indirectly obtained from his compelled testimony and therefore should not have been considered.

Consideration of the aforementioned evidence is, in a manner of speaking, an abuse of the Commission's discretion. This Court has no power to simply substitute its own discretion for that of the Commission. However, "[i]f the court has found that the Board has abused its discretion, it may remand the case to the Board with instructions for correction. If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable period, failing which it may order the petitioner discharged from custody." *Billiteri v. United States Board of Parole,* 541 F.2d 938, 946 (2d Cir.1976).

Accordingly, it is hereby

ORDERED that the Parole Commission is to immediately reevaluate the petitioner's parole status in a manner consistent with this opinion with its Notice of Action being released no later than Friday, September 23, 1988; more specifically, this should be a *de novo* type of hearing with no consideration being given to information gleaned from petitioner's compelled testimony, from his presentence investigation report, or from Williams' prior statements to the Commission. Should the Commission again recommend going above the guidelines, an explanation sufficiently detailed to explain the Commission's basis for doing so should be included. Further

ORDERED that in the event of non-compliance, the Court will promptly grant the

writ of habeas corpus and order the prisoner discharged from custody.