794 F.2d 843
 55 USLW 2068, 55 USLW 2107, Fed. Sec. L.
Rep. P 92,827,
1986-1 Trade Cases 67,183,
RICO Bus.Disp.Guide 6303
 Michael M. RAND, John Costello, Steven J. Costello, Gregory
T. Frese, Edward Lavin, Peter A. Milano and
Vincent F. Servello, Plaintiffs-Appellants,
v.
ANACONDA-ERICSSON, INC., Ericsson, Inc., L.M. Ericsson
Telephone Company, Nordic American Bank, Citibank, N.A.,
Price-Waterhouse & Co., Sullivan & Cromwell, Richard Howe,
Richard G. Lyon, L. Stanton Towne, Telecom Equipment Corp.
and Stephen R. Cohen, Defendants-Appellees.
 No. 978, Docket 86-7034.
 United States Court of Appeals,
Second Circuit.
 Argued March 31, 1986.
Decided July 9, 1986.
 
 Walter C. Reid, New York City (Carl E. Person, New York City, of counsel), for plaintiffs-appellants.
 Robinson B. Lacy, New York City (Robert M. Osgood, Sullivan & Cromwell, New York City, of counsel), for defendants-appellees Anaconda-Ericsson, Inc., Ericsson, Inc., L. M. Ericsson Telephone Co., Sullivan & Cromwell, Richard R. Howe, Richard G. Lyon, and L. Stanton Towne.
 Richard G. Lyon, Greenwich, Conn., pro se and for defendants-appellees Anaconda-Ericsson, Inc., Ericsson, Inc., and L. M. Ericsson Telephone Co.
 Allan L. Gropper and Robert J. Morrow, White & Case, New York City, for defendant-appellee Nordic American Banking Corp.
 Philip K. Howard, Howard, Darby & Levin, New York City, for defendant-appellee Price Waterhouse & Co.
 William B. Pennell, Shearman & Sterling, New York City, for defendant-appellee Citibank, N.A.
 Paul S. McDonough, Long Island City, N.Y., for defendants-appellees Telecom Equipment Corp. and Stephen R. Cohen.
 Before OAKES, JON O. NEWMAN and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This case arises out of the relationship between Teltronics Services, Inc. ("Teltronics"), a now-bankrupt distributor of telephone equipment, and its principal creditor and supplier, L.M. Ericsson Telecommunications, Inc. ("Ericsson"). This action was brought by a number of Teltronics shareholders who allege that the company's collapse was caused by actions of the several defendants. These defendants include companies affiliated with Ericsson as well as other parties that are alleged to have aided Ericsson in its plan to force Teltronics into bankruptcy. The shareholders seek damages under a number of statutes: the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 et seq. (1982); Section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982); Section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e) (1982); and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1985). Judge Neaher granted summary judgment for defendants. Rand v. Anaconda-Ericsson, Inc., 623 F.Supp. 176 (E.D.N.Y.1985). We affirm.
 
 BACKGROUND
 
 2
 This action is only the latest in a series of cases arising out of the commercial demise of Teltronics. See Teltronics Services, Inc. v. Anaconda-Ericsson, Inc., 587 F.Supp. 724 (E.D.N.Y.1984), aff'd, 762 F.2d 185 (2d Cir.1985); L M Ericsson Telecommunications, Inc. v. Teltronics Services, Inc. (In re Teltronics Services, Inc.), 18 B.R. 705 (Bankr.E.D.N.Y.1982); Teltronics Services, Inc. v. L M Ericsson Telecommunications, Inc., 486 F.Supp. 836 (S.D.N.Y.), on reargument, 491 F.Supp. 538 (S.D.N.Y.1980), aff'd, 642 F.2d 31 (2d Cir.), cert. denied, 452 U.S. 960, 101 S.Ct. 3108, 69 L.Ed.2d 971 (1981); Teltronics Services, Inc. v. L.M. Ericsson Telephone Co., No. 79 Civ. 1233, slip op. (S.D.N.Y. May 9, 1979).
 
 
 3
 According to the complaint, Ericsson was the chief supplier of telephone equipment to Teltronics and also its principal creditor. Friction between the two companies began in 1978, when the New York-based Teltronics opened an office to compete with an Ericsson subsidiary in New England. Teltronics' method of financing equipment purchases was through the issuance of notes to defendants Citibank, N.A. ("Citibank") and Nordic American Bank ("Nordic"), an Ericsson affiliate. Payment on these notes was guaranteed by Ericsson. In return for the guarantee, Ericsson held a security interest in the revenues generated by Teletronics' leases of equipment. The loan agreements contained an acceleration clause, under which the lenders could demand the outstanding balance on the notes in the event that Teltronics was late in making a monthly interest payment.
 
 
 4
 Plaintiffs' theory is that Ericsson led Teltronics to believe that it need not make an interest payment due to Nordic at the end of February, 1979. When Teltronics failed to make the payment, a default and acceleration was declared by Nordic, and Ericsson, as guarantor of the notes, paid the loans. Teltronics, unable to find alternative sources of financing, was forced into involuntary bankruptcy in September, 1979. The default and subsequent bankruptcy allegedly allowed Ericsson to receive the income from many of Teltronics' equipment leases under its security interest, and also to set up a New York subsidiary that eventually took a great many of Teltronics' customers for itself.
 
 
 5
 Meanwhile, litigation began. A first action, filed by Teltronics in the United States District Court for the Southern District of New York, alleged that the default was engineered by Ericsson in order to take over Teltronics' business. The complaint was dismissed under Fed.R.Civ.P. 12(b)(6), Teltronics Services, Inc. v. L.M. Ericsson Telephone Co., No. 79 Civ. 1233, slip op. (S.D.N.Y. May 9, 1979), and no appeal was taken. Teltronics filed a second action in the Southern District three months after judgment was entered, based on the same course of conduct alleged in the first. The District Court for the Southern District dismissed Teltronics' second action on res judicata grounds. This court affirmed. Teltronics Services, Inc. v. L M Ericsson Telecommunications, Inc., 486 F.Supp. 836 (S.D.N.Y.), on reargument, 491 F.Supp. 538 (S.D.N.Y.1980), aff'd, 642 F.2d 31 (2d Cir.), cert. denied, 452 U.S. 960, 101 S.Ct. 3108, 69 L.Ed.2d 971 (1981).
 
 
 6
 Meanwhile, on September 18, 1979, while the second action in the Southern District was pending, creditors initiated an involuntary bankruptcy proceeding against Teltronics in the Eastern District. On April 30, 1980, Teletronics was adjudicated a bankrupt. A trustee in bankruptcy was appointed and sought to assert a claim for equitable subordination of Ericsson's claims against the bankrupt. After a twenty-day trial, Bankruptcy Judge Parente held in a detailed opinion that Ericsson had not engaged in misconduct and that equitable subordination was not warranted. In particular, he found that Ericsson "never represented to Teltronics that Teltronics would not be required to make a timely payment of the interest due to Nordic on February 18, 1979," and that the Teltronics management knew that the company was obliged to pay the interest to Nordic on that date. Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.), 29 B.R. 139, 157 (Bankr.E.D.N.Y.1983). The trustee appealed, but a settlement was reached between the trustee and Ericsson before the appeal was argued. Other Teltronics creditors, including Rand and Frese, shareholder plaintiffs in the present action, challenged the settlement, which was nevertheless upheld by the bankruptcy court, the district court, and ultimately this court. See In re Teltronics Services, Inc., 762 F.2d at 188.
 
 
 7
 Meanwhile, on April 12, 1983, Edward Beagan, Chairman of Teltronics' Board, brought an action on behalf of himself and Teltronics against Ericsson in the Eastern District on grounds similar to those pressed in the instant case. Judge Neaher held that only the bankruptcy trustee could represent Teltronics and granted summary judgment against Beagan on his individual claims. Teltronics Services, Inc. v. Anaconda-Ericsson, Inc., 587 F.Supp. 724, 729, 734. Beagan's case was consolidated on appeal with the challenge to the settlement and was also affirmed. In re Teltronics Services, Inc., 762 F.2d at 193.
 
 
 8
 The current action was filed in the Eastern District on September 23, 1983, by seven named plaintiffs who sought to represent a class of all those who on or after March 5, 1979, were shareholders of Teltronics. Although the present case involves new plaintiffs, the underlying events are exactly the same as those that spawned the earlier litigation. Plaintiffs' factual claims, moreover, were rejected by the bankruptcy court after a twenty-day trial. That court found that Ericsson and its agents never represented to Teltronics that Teltronics would not be required to make a timely payment of the interest due to Nordic on February 28, 1979, and that the Teltronics management knew that the company was obliged to pay the interest to Nordic on that date. Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.), 29 B.R. at 157.
 
 
 9
 Defendants moved in November, 1983, to dismiss and for summary judgment. Before plaintiffs filed opposing papers, a conference was held at which the district court advised the parties that it was holding defendants' motion in abeyance pending the outcome of the appeal concerning the trustee's settlement and the Beagan action, eventually decided on March 22, 1985. In re Teltronics Services, Inc., 762 F.2d 185. On August 30, 1985, Judge Neaher granted defendants' motion for summary judgment in its entirety and dismissed the complaint. Rand v. Anaconda-Ericsson, Inc., 623 F.Supp. 176, 184 (E.D.N.Y.1985). Plaintiffs and their attorneys were enjoined from pursuing any new or pending litigation that concerns Teltronics. Id. at 185. The district court also held that sanctions under Rule 11, Fed.R.Civ.P., were appropriate, but did not determine the actual amount to be paid. After the district judge denied plaintiffs' motion to reconsider, this appeal followed.
 
 DISCUSSION
 1. The Securities Exchange Act Claim
 
 10
 Plaintiffs allege that Ericsson issued a fraudulent press release over the Dow Jones newswire on March 6, 1979, and that this fraud was "in connection with the purchase or sale of a security" in violation of Section 10(b) and Rule 10b-5.[1]
 
 
 11
 The press release, which is set out in the margin,[2] announced that Ericsson had declared Teltronics to be in default under its security agreement and that it was commencing legal action against Teltronics to recover the payments Ericsson had made as guarantor. Plaintiffs allege that Ericsson's accountants, Price-Waterhouse & Co., had advised Teltronics' accountants that no payment of interest or principal on any of the Nordic or Citibank loans was due until March 31, 1979. They further allege that Ericsson's attorneys, Sullivan & Cromwell, secretly met with the president of the Nordic bank and told him not to credit Teltronics' account with $250,000 then on deposit at the bank because Ericsson wanted a "nominal" default on the interest payment.
 
 
 12
 Plaintiffs also allege that at all pertinent times Teltronics had various corporate suitors attempting to acquire it. They claim that the press release was part of a scheme to prevent Teltronics from being acquired, and thus to assure that Ericsson could take over Teltronics' business. Plaintiffs reason that the press release discouraged the corporate suitors, made it impossible to secure other sources of financing, and directly resulted in Teltronics' involuntary bankruptcy. Once in bankruptcy, plaintiffs' shares were converted into a claim for cash, a situation which plaintiffs argue constitutes a "forced sale." Plaintiffs conclude that this "forced sale" renders the press release a misrepresentation made "in conection with" a securities transaction for purposes of Section 10(b).
 
 
 13
 We disagree. To fall within Section 10(b), misrepresentations must have some direct pertinence to a securities transaction. In Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), for example, an auditor misrepresented the financial condition of a corporation seeking a loan from the bank. The loan was to be collateralized by the stock of the borrower's subsidiary. We noted that none of the alleged misrepresentations pertained to the pledged securities and that the incidental involvement of securities as collateral did not by itself implicate the anti-fraud provisions of the federal securities laws. In Securities and Exchange Commission v. Drysdale Securities Corp., 785 F.2d 38 (2d Cir.1986), cert. denied, --- U.S. ----, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986), however, we held that misrepresentations about the financial condition of a broker-dealer were "in connection with" a securities transaction where the broker-dealer's financial strength was directly related to its ability to carry out obligations under agreements calling for the repurchase or resale of government securities. The misrepresentations thus went to the consideration for a securities transaction. In the present case we do not have even the incidental involvement of securities that existed in Chemical Bank. Only the filing for bankruptcy in September, 1979, viewed in the most tortured fashion, purports to link the conduct of the defendants to the purchase or sale of a security.
 
 
 14
 The "forced sale" doctrine is of no aid to appellants, however, because its application has been limited to securities transactions resulting in an intra-firm freeze-out of one group of investors by another. Mayer v. Oil Field Systems Corp., 721 F.2d 59 (2d Cir.1983) (buyout of limited partners with artificially overvalued stock); Coffee v. Permian Corp., 434 F.2d 383 (5th Cir.1970) (fraud on minority shareholders in a liquidation), cert. denied, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.) (fraud in scheme involving purchase of one class of securities, followed by tender offer for another class, followed by short-form merger), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). These cases involve conventional transactions in the capital market where the transaction allegedly involves fraud, and some securities holders are forced by other investors in the same firm to trade their investments for cash.
 
 
 15
 Plaintiffs' claim is based upon a virtually limitless legal theory that would convert any fraudulent conduct resulting in a corporate bankruptcy into securities fraud. For instance, it would encompass misrepresentations about the nature of a competitor's goods or the use of industrial spies, conduct wholly remote from transactions in the market for capital. The artificiality of the theory is further demonstrated by the fact that the securities laws would come into play only when a bankruptcy occurs. Shareholders injured by the very same conduct but whose company was merely diminished in value rather than destroyed would have no right of action.
 
 
 16
 The perversity of appellants' argument is further demonstrated by consideration of the effect it would have, if adopted, on bankruptcy proceedings. The damage claim asserted by the shareholders is identical to Teltronics' claim against Ericsson for tortious interference with its business. If Teltronics' bankruptcy were to trigger an otherwise non-existent Section 10(b) claim, the bankruptcy court would not be able to accord the various claimants their proper priority in the distribution of assets. A major corporate asset, the claim against Ericsson, would by virtue of the bankruptcy itself be shared by the bankruptcy trustee and the shareholders as well. Were we to recognize the shareholders' claim as valid, many undesirable results would follow. First, the actual value of the bankrupt estate could not be determined. Second, either the defendants would be forced to pay a double recovery or the rights of senior claimants, the creditors, would be subordinated to the rights of the most junior claimants, the equity holders. In the present case, Ericsson settled with the trustee in the understandable belief that he alone could assert the damage claim. Had there been any hint that individual shareholders could also assert this claim, a settlement would have been possible only if the shareholders were also satisfied, a condition that would have made the terms available to creditors less favorable.
 
 2. The Williams Act Claim
 
 17
 Plaintiffs claim that a December 5, 1978 letter from Ericsson to Beagan constitutes a "tender offer," and that the Ericsson press release announcing the Teltronics default was thus a false or misleading communication "in connection with" this tender offer prohibited by Section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e).
 
 
 18
 The letter to Beagan proposed a transaction in which Ericsson would purchase 785,000 Teltronics shares and an option for an additional 330,000 shares from Teltronics. Ericsson would also have gained a right of first refusal to purchase 288,644 shares from Beagan. The transaction was conditioned upon further investigation, including an audit, of Teltronics by Ericsson; approval by Ericsson's board of directors; and approval by Teltronics' stockholders following the distribution of proxy materials.
 
 
 19
 The present case is directly controlled by Hanson Trust PLC v. SCM Corp., 774 F.2d 47 (2d Cir.1985). We held there that several private purchases of securities did not constitute a tender offer under the Williams Act. We noted generally that
 
 
 20
 the question of whether a solicitation constitutes a "tender offer" within the meaning of Sec. 14(d) turns on whether, viewing the transaction in light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.
 
 
 21
 Id. at 57. As in Hanson Trust, the number of offerees in the present case was small, there was no widespread solicitation, the putative sellers were ideally positioned to appraise the offer, there was no pressure in light of the tentative and conditional nature of the letter, and there was no time limit. Id. at 57-58. The letter, therefore, lacked the essential characteristics of a tender offer, and misstatements, if any, in the Ericsson press release cannot support a claim under the Williams Act.
 
 3. The Sherman Act Claim
 
 22
 The district court correctly held that plaintiffs' claim under Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, failed for lack of standing. 623 F.Supp. at 184; see also 587 F.Supp. at 730. In Associated General Contractors of California, Inc. v. California Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court noted favorably the decision in Loeb v. Eastman Kodak Co., 183 F. 704 (3d Cir.1910), stating that Loeb "held as a matter of law that neither a creditor nor a stockholder of a corporation that was injured by a violation of the antitrust laws could recover." Associated General, 459 U.S. at 533, 103 S.Ct. at 906. In Loeb, as in the instant case, a stockholder/creditor sued under the antitrust laws, alleging that his stock was rendered worthless and that his claim against the company was only partially satisfied because defendants' alleged antitrust violation drove the company into bankruptcy. See 183 F. at 706-07. The court held that only the bankruptcy trustee could assert the claims set forth in the complaint, and, therefore, that the plaintiff lacked standing. Plaintiffs' antitrust claim is without merit.
 
 4. The RICO Claim
 
 23
 Plaintiffs assert that defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1962(a), (b), (c), 1964(c) (1982). As predicate felonies to support a pattern of racketeering activity, they allege securities fraud, bankruptcy fraud, wire fraud, mail fraud, obstruction of justice, and obstruction of a criminal investigation by the Securities and Exchange Commission. 623 F.Supp. at 180. The district court dismissed the RICO claim on two grounds. First, it held that the complaint properly alleged only one predicate act--wire fraud arising from the Ericsson press release--and therefore did not meet the RICO requirement of two predicate acts. 623 F.Supp. at 182. As a second basis for dismissal, the district court held that plaintiffs' rights are merely derivative of those of Teltronics, and that plaintiffs therefore lack standing to sue under RICO. Id.
 
 
 24
 We agree with the district court that plaintiffs lack standing to sue under RICO, for reasons similar to their lack of standing under the antitrust laws. The legal injury, if any, was to the firm. Any decrease in value of plaintiffs' shares merely reflects the decrease in value of the firm as a result of the alleged illegal conduct. The Sixth Circuit has dismissed a RICO claim in exactly this setting, saying that under RICO an
 
 
 25
 "action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation. The shareholder's rights are merely derivative and can be asserted only through the corporation.... [D]imunition in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right."
 
 
 26
 Warren v. Manufacturers National Bank of Detroit, 759 F.2d 542, 544 (6th Cir.1985) (quoting Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir.1981)); see also Carter v. Berger, 777 F.2d 1173, 1176 (7th Cir.1985) (In RICO case, "an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief."). The RICO action, like plaintiffs' Section 10(b) claim, is a corporate asset, and shareholders cannot bring it in their own names without impairing the rights of prior claimants to such assets.
 
 
 27
 We do not address the district court's further holding that plaintiffs have alleged only a single predicate act.
 
 5. Sanctions
 
 28
 The injunction against further litigation involving Teltronics by plaintiffs or their attorneys has not been briefed on appeal. The record clearly justifies such relief, however. Plaintiffs and their attorneys seem to believe that if at first you don't prevail, sue, sue again. The time has come to stop this repetitive litigation. We therefore affirm the injunction.
 
 
 29
 The imposition of costs and attorney's fees under Rule 11, Fed.R.Civ.P., is not before us at this time, although appellants chose to brief the issue. When appellees moved to adjourn the briefing and argument of this appeal until the amount of such costs and fees was finally determined by the district court, appellants opposed on the ground that an appeal from such a determination might not be taken. Because we denied appellees' motion, the Rule 11 issue is clearly not before us.
 
 
 30
 Affirmed.
 
 
 
 [1]
 The relevant text of Section 10(b), 15 U.S.C. Sec. 78j(b), provides:
 It shall be unlawful for any person, ...
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....
 Rule 10b-5 also is limited to fraudulent behavior "in connection with the purchase or sale of any security." 17 C.F.R. Sec. 240.10b-5 (1985).
 
 
 [2]
 As alleged in the complaint, the press release issued over the Dow Jones newswire on March 6, 1979, stated in full:
 L.M. Ericsson Telecommunications says it filed Teltronics suit.
 NY--DJ--LM Ericsson Telecommunications, Inc. announced that it commenced an action against Teltronics Services, Inc. to recover $4.9 million which Ericsson as guarantor of Teltronics indebtedness had paid to Nordic American Bank, Inc.
 As part of that action, Ericsson had filed a motion seeking to attach certain Teltronics assets.
 That motion will be heard on March 9th in New York State Supreme Court in Queens County where the action was filed.
 On March 5th Ericsson said it declared Teltronics to be in default under a security agreement between them and today notified certain customers of Teltronics--whose leases are subject to the security agreements--that payment should be made to Ericsson.
 1:43 p.m. E.S.T. March 6, 1979.