50 F.3d 1493
 63 USLW 2655, Fed. Sec. L. Rep. P 98,649,
33 Collier Bankr.Cas.2d 270, 27 Bankr.Ct.Dec. 14,
Bankr. L. Rep. P 76,446
 James JACOBSON, and Arthur Fury, on behalf of themselves and
all others similarly situated, et al., Plaintiffs-Appellants,
v.
AEG CAPITAL CORP.; Frank Maier; Gunther Ertelt; and John
Does 1-10, et al., Defendants-Appellees.
 No. 92-16603.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1994.
Decided March 29, 1995.
 
 James R. Malone, Jr., Chimicles, Jacobsen & Tikellis, Haverford, PA, Andrew J. Ogilvie, San Francisco, CA, for plaintiffs-appellants.
 Jerome S. Hirsch, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: POOLE, BEEZER and NELSON, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 Plaintiffs James Jacobson and Arthur Fury (Jacobson and Fury), shareholders of Siliconix, Inc., appeal the district court's dismissal of their securities fraud action which alleged that AEG Capital Corporation (AEG) and two AEG directors had violated section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. Sec. 78j(b)). Jacobson and Fury allege that AEG used Siliconix's Chapter 11 reorganization to fraudulently divest the ownership interests of non-AEG shareholders of Siliconix. We affirm the district court's dismissal as a valid entry of summary judgment in favor of AEG and its directors.I. FACTUAL AND PROCEDURAL BACKGROUND
 
 
 2
 Siliconix manufactures semiconductors. In the late 1980s a burdensome combination of large capital expenditures, increased competition, and decreasing government contracts narrowed Siliconix's profit margins. In 1989 Siliconix suffered a $28 million loss.
 
 
 3
 One of Siliconix's large capital expenditures was an expansion in 1984 into the production of circuits known as Power MOSFETs. Power MOSFETs became an important part of Siliconix's product line. In 1986 International Rectifier Corporation (IR) sued Siliconix for willful patent infringement, alleging that Siliconix's manufacture of Power MOSFETs violated IR's patents. An adverse judgment had the potential of eliminating $30-40 million of Siliconix's annual sales.
 
 
 4
 On April 9, 1990, at the close of the patent infringement trial, but before entering judgment, the federal trial judge advised the parties orally that he was prepared to rule against Siliconix.
 
 
 5
 The following day, April 10, 1990, Siliconix filed a reorganization petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California. This petition appears to have been filed in order to gain the protection of a bankruptcy stay against an imminent adverse judgment in the patent infringement litigation. See 11 U.S.C. Sec. 362.
 
 
 6
 At the time that Siliconix sought bankruptcy protection, AEG owned approximately 40% of Siliconix's common stock. Plaintiffs Jacobson and Fury, along with approximately two thousand others, also owned common stock in Siliconix.
 
 
 7
 The United States Trustee for the Northern District of California appointed the Official Unsecured Creditors' Committee (Creditors' Committee) on May 1, 1990. The bankruptcy court directed the appointment of an Official Committee of Equity Security Holders (Equity Committee) on July 25, 1990. The United States Trustee appointed members of the Equity Committee on August 6, 1990. Jacobson and Fury were members of the Equity Committee. AEG was not.
 
 
 8
 AEG, with the help of its parent company AEG AG, approached Siliconix on July 24, 1990 with a proposal to infuse Siliconix with the cash it needed in order to emerge from Chapter 11 and help Siliconix craft a plan of reorganization. In return, as part of the plan of reorganization, AEG would receive 80.1% of Siliconix stock.
 
 
 9
 The final plan of reorganization, jointly proposed by Siliconix, AEG, and AEG AG, provided for a settlement of the IR litigation mentioned above, cash and notes equal to about 80% of claims by bank and trade creditors, and newly issued subordinated notes and stock (750,000 shares, or 7.5%) to debenture holders. All Siliconix stock would be cancelled. Non-AEG shareholders could redeem their stock on a pro-rata basis, for 1,240,000 (or 12.4%) shares of the new Siliconix common stock. To finance the reorganization, AEG agreed to contribute $13 million in cash, AEG AG agreed to forgive a $2 million secured claim against Siliconix, and AEG AG agreed to guarantee payment of certain promissory notes. In return, AEG would receive 8,010,000 (or 80.1%) of the new Siliconix common stock.
 
 
 10
 After notice and hearing the bankruptcy court approved the plan's disclosure statement on November 9, 1990. Parties in interest were given until December 7, 1990 to accept or reject the plan by vote. The disclosure sent to shareholders was accompanied by the Equity Committee's recommendation to vote in favor of the plan. Following acceptance, and without objection, Bankruptcy Judge Lloyd King confirmed the plan on December 10, 1990.
 
 
 11
 Six months after confirmation, on June 10, 1991, Jacobson and Fury filed a complaint in federal district court alleging that AEG had engaged in a fraudulent scheme which used the bankruptcy process as a way to divest them, and similarly situated non-AEG Siliconix shareholders, of their securities in violation of federal securities laws. The suit was never certified as a class action. On November 15, 1991 defendants moved to dismiss. They later made a motion for summary judgment. Following a hearing on January 17, 1992, Judge Walker ordered further briefing on the forced sale issue. On August 12, 1992, Judge Walker granted defendant's motion to dismiss for failure to state a claim. Jacobson and Fury made a timely appeal.
 
 II. DISCUSSION
 A. Standard of Review
 
 12
 We review a motion for dismissal for failure to state a claim de novo. Oscar v. University Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). If matters outside the pleadings are submitted, the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is treated as one for summary judgment under Federal Rule of Civil Procedure 56. See Fed.R.Civ.P. 12(b); Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 920 F.2d 1496, 1507-08 (9th Cir.1990). In considering AEG's motion to dismiss, the district court took judicial notice of the extensive records and transcripts from the prior bankruptcy proceedings (In re: Siliconix Inc., No. 3-90-01275-LK (Bankr.N.D.Cal.)). We therefore review the district court's dismissal as an order granting summary judgment.
 
 
 13
 This court reviews orders granting summary judgment de novo and applies the same standard that guides the district court. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). Accordingly, we must determine, viewing the evidence most favorably to the appellants, whether there are any genuine issues of material fact which should have gone to a trier of fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 14
 Although the district court treated the dismissal as a Rule 12(b)(6) dismissal, the plaintiffs were given ample opportunity to brief the issues involved and submit affidavits and declarations in support of their position. Neither party claims that there is a dispute of material fact with regard to the dispositive issues in this case.
 
 B. Statutory Immunity Under Section 1125(e)
 
 15
 Section 1125(e) of the Bankruptcy Code provides:
 
 
 16
 A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates in good faith and in compliance with the provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.
 
 
 17
 AEG argues that section 1125(e) provides them with statutory immunity from liability under the securities laws. Jacobson and Fury, however, contend that section 1125(e) governs only the disclosure statement, and that their claim "is not premised exclusively on a false and misleading disclosure statement, but ... on a broader scheme to freeze out non-AEG shareholders." Opening Br. of Plaintiffs-Appellants at 34. In other words, section 1125(e) is not a per se rejection of the forced seller doctrine. Although Jacobson and Fury cite no authority for this proposition, the plain language of section 1125(e) and its location in the section which outlines the procedures and requirements of disclosure and solicitation, both suggest that section 1125(e) only provides a safe harbor for the disclosure and solicitation process of a bankruptcy. In other words, if the securities fraud alleged came from some other source or procedure than disclosure and solicitation, then section 1125(e) would not provide immunity.
 
 
 18
 Moreover, although section 1125(e) provides a safe harbor, by its very terms it does not protect acts carried out in bad faith. See, e.g., IV Louis Loss and Joel Seligman, Securities Regulation at 1676 (3d ed. 1990) (Section 1125(e) "does not affect civil or criminal liability for defects and inadequacies that are beyond the limits of the exoneration that 'good faith' provides."); 2 Thomas J. Salerno, John R. Clemency, Craig D. Hansen, Advanced Chapter 11 Bankruptcy Practice Sec. 10.21 ("One could easily imagine securities fraud suits stemming from a bankruptcy court adjudication that a disclosure statement contained 'materially false' information."). We note, however, that the bankruptcy court specifically found that "[t]he Plan ha[d] been proposed in good faith and not by any means forbidden by law." Clerk's R., Ex. G at 2-3. The complaint in this case alleges a fraudulent scheme broader than the solicitation and disclosure portions of the bankruptcy process. For purposes of summary judgment, we assume these allegations are true and hold that the defendants are not statutorily immune from suit under section 1125(e).
 
 C. Claim and Issue Preclusion
 1. Res Judicata
 
 19
 In order to satisfy constitutional concerns presented by Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), bankruptcy courts may only hear and determine "core proceedings" arising under the Bankruptcy Code. 28 U.S.C. Sec. 157(b)(1). Although bankruptcy courts may hear non-core proceedings that are "related to" bankruptcy (28 U.S.C. Sec. 157(c)(1)), they cannot determine related issues absent the consent of all parties. 28 U.S.C. Sec. 157(c)(2). Absent such consent, the bankruptcy court can only propose findings of fact and conclusions of law that are subject to de novo review by the district court. 28 U.S.C. Sec. 157(c)(1).
 
 
 20
 In evaluating the res judicata effect of a bankruptcy case, we have recently held that there is "no structural obstacle to a core proceeding's having a preclusive effect on a later non-core claim." In re International Nutronics, Inc., 28 F.3d 965, 970 (9th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 577, 130 L.Ed.2d 493 (1994). We thus disagree with the Fifth and Seventh Circuit cases which have held differently on this same subject. See Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 189-90 (5th Cir.1990); Barnett v. Stern, 909 F.2d 973, 978 (7th Cir.1990).
 
 
 21
 In this case the bankruptcy court made findings of fact and conclusions of law regarding the sufficiency of the disclosure and plan of reorganization for purposes of confirmation. It did not make any binding determination regarding independent allegations of securities fraud, which would have been issues of non-core proceedings. Thus, the court's confirmation of the plan of reorganization could not bar the entirety of plaintiffs' claims.[1] However, we do not consider whether the claims here are barred due to res judicata, as we choose to decide this case on the merits.
 
 2. Collateral Estoppel
 
 22
 AEG contends that Jacobson and Fury's securities fraud claim turns on the issue of AEG's "good faith" in presenting its plan of reorganization, that the issue of AEG's good faith was fully litigated by the bankruptcy court, and that this issue is therefore barred by the doctrine of collateral estoppel. This argument stems in part from our requirement that the bankruptcy court make its own inquiry into good faith (See, e.g., In re Goeb, 675 F.2d 1386, 1390 (9th Cir.1982)), and the fact that Judge King specifically found that the plan was proposed in good faith. Nevertheless, the issue of "good faith" relates only to the disclosure statement, and as we have noted earlier Jacobson and Fury's claim "is not premised exclusively on a false and misleading disclosure statement, but ... on a broader scheme to freeze out non-AEG shareholders." Opening Br. of Plaintiffs-Appellants at 34. Even if the issue of "good faith" in disclosure and solicitation of its plan of reorganization had been fully litigated in the bankruptcy court, Jacobson and Fury's security fraud claims, construed most favorably to them, turn on more than disclosure and solicitation. Consequently, their securities fraud claims are not barred by the doctrine of collateral estoppel.D. Chapter 11 and the Forced Sale Doctrine[2]
 
 
 23
 Chapter 11 of the United States Bankruptcy Code provides a judicially supervised method for corporations to reorganize their obligations. Section 1123, which governs the provisions of a Chapter 11 reorganization plan, permits plans which alter the rights of secured creditors, unsecured creditors, and equity holders. All plans of reorganization require full disclosure to all parties in interest who, if their claims are impaired, are then given the opportunity to vote on the plan. Following the vote, the bankruptcy court must independently confirm the plan.
 
 
 24
 The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their shares for money or other consideration, or forced to fundamentally change the nature of plaintiffs investments as the result of a fraudulent scheme. Mosher v. Kane, 784 F.2d 1385, 1389 (9th Cir.1986) (citations omitted), overruled on other grounds by In re Washington Pub. Power Supply Sys. Sec. Lit., 823 F.2d 1349 (9th Cir.1987) (en banc). For example, a fraudulent scheme resulting in an intra-firm freeze-out is actionable under Rule 10b-5 as a forced sale.
 
 
 25
 Jacobson and Fury allege that AEG used the bankruptcy proceedings as part of a fraudulent scheme to freeze them out, and that they therefore have a cause of action under Rule 10b-5.
 
 
 26
 AEG argues that as a matter of law the alteration of shareholder rights within a consensual, judicially supervised Chapter 11 corporate reorganization is immune from 10b-5 action under the forced sale doctrine.
 
 
 27
 The district court, relying on Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986), agreed with AEG and held that the forced sale doctrine "does not apply where equity interests are altered by the operation of a plan approved by a bankruptcy court." ER 427.
 
 
 28
 Although in Rand the Second Circuit refused to apply the forced sale doctrine to an involuntary bankruptcy, Jacobson and Fury correctly point out that the bankruptcy context was not the only reason which kept the plaintiffs in Rand from using the forced sale doctrine. In Rand shareholders in Teltronics attempted to sue Teltronics' creditors who had filed an involuntary bankruptcy petition against Teltronics. As the Second Circuit pointed out, the forced sale doctrine is "limited to securities transactions resulting in an intra-firm freeze-out of one group of investors by another." 794 F.2d at 847 (emphasis added). Jacobson and Fury, who were shareholders, allege that they were frozen-out by a controlling shareholder, rather than creditors. Therefore, read narrowly, Rand does not control this case.
 
 
 29
 The logic of Jacobson and Fury's argument is straightforward. Intra-firm freeze outs are actionable in many circumstances. Mayer v. Oil Field Sys. Corp., 721 F.2d 59 (2d Cir.1983) (fraudulent buyout of limited partners actionable); Vine v. Beneficial Fin. Co., 374 F.2d 627 (2d Cir.) (fraudulent acquisition followed by short-form merger actionable); cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); Alley v. Miramon, 614 F.2d 1372 (5th Cir.1980) (fraudulent corporate liquidation actionable). When Siliconix filed for bankruptcy protection, plaintiffs and other non-AEG Siliconix shareholders together owned more than 60% of Siliconix stock. When Siliconix emerged from bankruptcy, Plaintiffs' stock had been canceled, and the non-AEG shareholders only had rights to 12.4% of a new issue of Siliconix stock. Plaintiffs argue that the cloak of bankruptcy is not enough to immunize this type of freeze-out from liability under the securities laws.
 
 
 30
 Jacobson and Fury's argument, however, ignores the purpose of the forced sale doctrine, the purpose and procedures of Chapter 11, and the facts of this particular case.
 
 
 31
 The forced sale doctrine relaxes the requirement that only traditional purchasers or sellers of securities have standing to bring a Section 10(b) claim (see, e.g. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975)). A shareholder who is forced to sell or alter her securities as the result of a fraudulent scheme is deemed a seller for purposes of the securities laws. The forced sale doctrine also eliminates the reliance requirement. Since a fraudulent scheme forced the sale or alteration of securities, a shareholder bringing an action under the forced sale doctrine need not prove reliance because she made no investment decision to participate in the transaction--the sale was forced by the operation of some rule (e.g., a short-form merger). Vine, 374 F.2d at 635 ("Whatever need there may be to show reliance in other situations ... we regard it as unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer."); see also, Joseph De Simone, Note, "Should Fraud on the Market Extend to the Context of Newly Issued Securities," 61 Fordham L.Rev. S151, S171-72 (1993).
 
 
 32
 But the forced sale doctrine does not cut a wide swath. Although recognized by the Ninth Circuit, we have rarely encountered instances where it applies. See, e.g., Stitt v. Williams, 919 F.2d 516, 525 (9th Cir.1990) (refinancing which damaged underlying equity of limited partnership but not the ownership interest not a forced sale); Securities Investor Protection Corp. v. Vigman, 803 F.2d 1513, 1519 (9th Cir.1986) (reimbursements by Securities Investor Protection Corp. to defrauded investors not a forced sale); Mosher, 784 F.2d at 1389 (no forced sale where plaintiffs have failed to allege an actual liquidation or a fundamental change in the nature of their investments); Shivers v. Amerco, 670 F.2d 826, 830 (9th Cir.1982) (100-1 reverse stock split to eliminate fractional shares followed by new but lower permissive repurchase agreement from majority shareholder not a forced sale); but see United States v. Margala, 662 F.2d 622, 626 (9th Cir.1981) (implicitly applying forced sale doctrine in context of criminal securities fraud prosecution; discussed infra at note 3).
 
 
 33
 The Supreme Court has explicitly refused to allow Section 10(b) claims for what are normally state law questions of fairness, business purpose, and breach of fiduciary duty related to freeze-outs and mergers. Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (alleged breaches of fiduciary duty in a Delaware short-form merger insufficient to state a claim under Sec. 10(b) or Rule 10b-5). The forced seller doctrine is a narrow exception which provides a cause of action to shareholders who, without any say, find themselves fraudulently forced-out of their securities.
 
 
 34
 Through Chapter 11 Congress has provided a comprehensive but complex method for resolving the obligations of a reorganizing corporation. The complexity has been severely criticized. Many legal commentators agree that Chapter 11's focus on a negotiated, consensual plan of reorganization is too costly and should be replaced with an auction or sale.[3] In a series of recent articles, Professors LoPucki and Whitford have shared the results of a comprehensive empirical analysis of Chapter 11 reorganizations of large publicly-traded corporations. This research suggests that by giving shareholders a voice in the negotiations over the plan of reorganization, Chapter 11 gives shareholders of insolvent companies far more than the black-letter bankruptcy priorities would seem to allow. In the wake of this finding, LoPucki and Whitford suggest only one reform: early elimination of shareholders interests. According to LoPucki and Whitford a preemptive "cram down" would beneficially reduce the bargaining leverage of shareholders in Chapter 11 negotiations. See Lynn M. LoPucki & William C. Whitford, "Preemptive Cram Down," 65 Am.Bankr.L.J. 625 (1991); Lynn M. LoPucki & William C. Whitford, "Bargaining Over Equity's Share in the Bankruptcy Reorganization of Large, Publicly Held Companies," 139 U.Pa.L.Rev. 125 (1990).
 
 
 35
 We express no opinion on whether it is socially desirable to give equity-holders a strategic voice in corporate reorganizations. Nonetheless, the concern about the shareholders' role in Chapter 11 reorganizations underlying this recent research speaks directly to the applicability of the forced sale doctrine to Chapter 11. Inasmuch as Chapter 11 gives shareholders the right to participate strategically and effectively in shaping the plan of reorganization, a judicially supervised Chapter 11 reorganization, as we have in this case, presents us with a very different scenario than those presented by the forced sale cases wherein investors had no opportunity to participate.
 
 
 36
 But we do not base our decision on commentary. We can point specifically to the many provisions in Chapter 11 which give equity holders influence over the plan of reorganization. For example, Chapter 11 gives the reorganizing corporation (known as the debtor-in-possession) the exclusive right to first propose a plan of reorganization. 11 U.S.C. Sec. 1121(b). Consequently, the scope and purpose of a plan of reorganization is initially an intra-firm decision, shaped by how the relevant state-law issues of corporate governance play out. See Richard F. Broude, Reorganizations Under Chapter 11 of the Bankruptcy Code, Sec. 6.06 ("shareholders still have the power to elect directors of the corporation, and the directors still have the power to elect officers and to guide the corporation's business activities where director action is required by state law.").
 
 
 37
 In this case, AEG had plurality ownership of nearly 40% in Siliconix. According to its stock purchase agreement, AEG controlled only two of five directors. Although we cannot ignore the collective action problem associated with organizing the other 60% of shareholders, neither can we ignore the fact that the non-AEG shareholders had actual legal rights to organize in order to influence Siliconix's board and hence the plan which Siliconix would adopt.
 
 
 38
 Even after a reorganization plan is unveiled dissatisfied equity holders have many options. Interested parties, i.e. creditors and shareholders (Sec. 1121(c)), acting in good faith, can circulate opposition to the debtor's plan. Century Glove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 100 (3d Cir.1988). Moreover, Bankruptcy Rule 3016(a) provides that "[a]ny party in interest other than the debtor, who is authorized to file a plan under Section 1121(c) of the Code, may file a plan at any time before the conclusion of the hearing on the disclosure statement or thereafter with leave of court." In order to aid negotiations, bankruptcy courts have given interested parties relatively wide latitude to "float" (as opposed to solicit votes for) alternative plans. See, e.g., In re Snyder, 51 B.R. 432, 437 (Bankr.D.Utah 1985). Although by filing this post-confirmation suit Jacobson and Fury have registered their opposition to Siliconix's plan, during the reorganization they did not circulate opposition to the plan, nor did they offer alternative plans.
 
 
 39
 Shareholders are also protected in some bankruptcy reorganizations by the committee of equity security holders. Sec. 1102. Any party in interest may petition the court for the appointment of additional committees, if necessary. Id. A committee has a fiduciary responsibility to represent the best interests of their constituency. Sec. 1103 In this case the bankruptcy court specifically authorized a committee of equity security holders. Most importantly, the bankruptcy court recognized the unique dynamics of having AEG jointly propose a plan of reorganization and therefore explicitly excluded AEG from the Equity Committee. The Equity Committee retained counsel whose fees were compensable as administrative costs conditioned on proof that counsel's services provided an actual benefit to the equity security holders.
 
 
 40
 Jacobson and Fury were not only represented by the five-person Equity Committee, they were members of the Equity Committee--members who brought not only interest, but expertise. Jacobson had been a vice-president of Siliconix and was responsible for Siliconix's Santa Clara assembly facility. Fury had been vice-president for marketing.
 
 
 41
 Reorganization plans require adequate disclosure to interested parties. Sec. 1125(b). The disclosure statement must be approved by the court after notice and hearing. Id. Failure to use reasonable care in preparing a disclosure statement found to be inaccurate can result in sanctions. See, e.g., In re Ligon, 50 B.R. 127, 133 (Bankr.M.D.Tenn.1985). Jacobson and Fury now challenge the adequacy of the disclosure statement based on reservations which they harbored as members of the equity committee during the reorganization. Nevertheless, at the hearing to review the disclosure statement, Mr. Milgrom, counsel for the Equity Committee, made no objection to the adequacy of disclosure.
 
 
 42
 In order for a reorganization plan to take effect a bankruptcy court must confirm it following a hearing. Prior to the confirmation hearing, creditors and shareholders vote on the plan. Plans deal with the various claims and interests by class. Sec. 1122(a). Provided that the plan satisfies the requirements of section 1129(a), if every class of claims and every class of interests accept the plan, the plan will be confirmed. This is typically referred to as a consensual reorganization.
 
 
 43
 With regard to Siliconix, the shareholders were a separate class represented by their own committee. Every impaired class, including the shareholders, voted for the plan. Indeed, Jacobson and Fury, as members of the Equity Committee, recommended that shareholders vote for the plan. No class of claims or interests objected to confirmation.
 
 
 44
 As yet a further precaution, most confirmation orders and many plans explicitly provide for continued bankruptcy jurisdiction over various disputes arising from the plan. See, e.g., S. Elizabeth Gibson, A Guide to the Judicial Management of Bankruptcy Mega-Cases 31-33 (1992). Such provision was made in the Siliconix case. With or without such a provision in the plan, section 1144 provides a procedure for any party of interest to obtain a revocation of the confirmation order "if and only if such order was procured by fraud." This procedure must be invoked within 180 days after entry of confirmation. Although Jacobson and Fury were uncomfortable with the plan at the time of confirmation, neither of them attempted to revoke the confirmation under section 1144.
 
 
 45
 A forced sale involves no communication with and no volitional acts by the plaintiff shareholder before the shares are eliminated or altered.[4] A properly conducted Chapter 11 reorganization requires both. Chapter 11 clearly provides equity security interests an opportunity to participate in the reorganization process. The record from the bankruptcy court relied upon by the district court indicates that Jacobson and Fury participated at each stage of this reorganization. It is perhaps for this reason that in Rand the Second Circuit felt compelled to limit the forced sale doctrine to cases which "involve conventional transactions in the capital market" rather than accede to a "virtually limitless legal theory that would convert any fraudulent conduct resulting in a corporate bankruptcy into securities fraud." 794 F.2d at 847-48.[5]
 
 III. CONCLUSION
 
 46
 The purpose of Chapter 11 is to provide a corporation with a new capital structure. See, e.g., 11 U.S.C. Sec. 1123; Douglas Baird & Thomas Jackson, Cases, Problems, and Materials on Bankruptcy, 2d ed. 948 (1990). If bankruptcy's absolute priorities prevailed each time, previous shareholders would often receive nothing. Were the forced sale doctrine made applicable to Chapter 11 it is conceivable that nearly every confirmed Chapter 11 reorganization could be converted into a securities fraud suit by understandably unhappy shareholders simply by alleging a predicate of fraud. This unsettling result is avoided, however, because a properly conducted Chapter 11 reorganization provides procedural and substantive safeguards to shareholders which are absent in the case of a forced seller.
 
 
 47
 For the foregoing reasons we AFFIRM the district court's dismissal as a valid grant of summary judgment in favor of AEG and its directors.
 
 
 
 [1]
 Claims of fraud in the disclosure and solicitation process are necessarily foreclosed by the bankruptcy court's finding of good faith. However, as we have said, Jacobson and Fury argue that the claims here were broader than fraud in that process. We assume, without deciding, that there were such claims, and that they were not foreclosed by the finding of good faith
 
 
 [2]
 Unless otherwise noted, all statutory references herein are to the United States Bankruptcy Code, codified at Title 11 of the United States Code
 
 
 [3]
 See, e.g., Mark J. Roe, "Bankruptcy and Debt: A New Model for Corporate Reorganization," 83 Colum.L.Rev. 527, 530 (1983) (proposing a floating of shares in a reorganized firm to set a value for other interests); Lucian A. Bebchuk, "A New Approach to Corporate Reorganizations," 101 Harv.L.Rev. 775 (1988) (junior creditors and shareholders are given successive options to purchase reorganized firm, proceeds paying senior creditors); Philippe Aghion, et al., "The Economics of Bankruptcy Reform," 8 J.L. Econ. & Organization 523 (1992) (Bebchuk options followed by mandatory vote among competing plans by new shareholders)
 
 
 [4]
 By implication United States v. Margala, 662 F.2d 622 (9th Cir.1981) provides helpful instruction on the link between shareholders' lack of volition or redress and the forced seller doctrine. Margala had been convicted of criminal securities and mail fraud in "a very complicated scheme to freeze out a corporation's public shareholders and underpay them for their stock." 662 F.2d at 623. The implicated transaction (a reverse stock-split and undervalued merger) satisfied the Sec. 10(b) requirement that Margala's nondisclosure or manipulation be "in connection with the purchase or sale of any security ..." because it was a forced sale. Id. at 627 n. 2
 Margala argued that he did not violate federal law because he did not withhold or misstate material facts. Margala proposed a test for materiality, viz., that information is material for purposes of securities fraud if an investor could have used the information to obtain a state injunction against the transaction. We rejected that test. We held that the proper test for the materiality of information is whether reasonable public investors would use the information to protect themselves from financial loss through steps short of injunction. The protective steps we identified included voting down the transaction, selling stock before the transaction, and exposing the plan in order to have it aborted. The facts omitted or misstated by Margala were material because had a reasonable shareholder known the facts underlying the plan to freeze him out "he would have successfully protected himself from financial loss." Id. at 627.
 This materiality test is important for understanding the forced sale doctrine. It is because Margala omitted or misstated facts which would have given a reasonable investor opportunities to vote, sell, or expose fraud, that he forced a sale of minority shares. Proper bankruptcy proceedings provide shareholders with adequate opportunities to vote and expose fraud.
 
 
 [5]
 Jacobson and Fury complain that the fast pace of this reorganization robbed them of any opportunity to alter what happened. It is true that taking a corporate reorganization of this size from filing to confirmation in roughly eight-months is relatively rapid. But such efficiency is to be commended rather than condemned where every required procedure was followed. Judge Lloyd King's careful attention to detail and to fairness is evidenced in the transcript of the proceedings at the disclosure hearing where the Equity Committee made no objections. Jacobson and Fury's fear of "cram down" only means that they were afraid the court might approve a fair and equitable plan which adhered strictly to the bankruptcy priorities. "Cram down" is merely bankruptcy jargon which means that shareholders would only get the residue of what was left after all senior classes (and all other classes are senior to shareholders) had been paid--in this case, nothing